UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LAMONT HEARD,

      *Plaintiff,*

*v.*

YARNICE STRANGE,
KYLE SHANNON, ADAM
DOUGLAS, CEDRIC GRIFFEY,
SCOTT SCHOOLEY, and
JEFFREY OASTERHOF

      *Defendants*.
_____/

CIVIL ACTION NO. 2:17-cv-13904

DISTRICT JUDGE NANCY G. EDMUNDS
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (R. 43, 46)

### I.  RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants'[1]

Motion for Partial Summary Judgment, (R. 43), be **GRANTED IN PART**, and that

Plaintiff Lamont Heard's Motion for Summary Judgment, (R. 46), be **DENIED**.

If the Court adopts this Report and Recommendation in full, it will:

---

[1] The motion is brought by every remaining defendant except Cedric Griffey, whose waiver of service was returned unexecuted on October 23, 2018. (R. 38). In December 2018, he Court ordered the Michigan Department of Corrections (MDOC) to provide the U.S. Marshal with an address for service for Griffey and again directed service. (R. 51). The record contains no indication that Griffey has yet been served. I note that Plaintiff's motion for summary judgment is as to every defendant, *including* Griffey. For ease of reference, I will use "Defendants" to mean Douglas, Oasterhof, Schooley, Shannon, and Strange; I will specifically indicate when Griffey is included.

- Dismiss defendants Adam Douglas and Jeffery Oosterhof[2] because Plaintiff failed to properly exhaust any claims against them.

- Dismiss Plaintiff's claims against defendants Cedric Griffey and Scott Schooley based on his housing unit transfer (January 2017 grievance). Plaintiff's claims against Griffey and Schooley based on his prison transfer (July 2017 grievance) would remain.

- Make no changes as to defendants Yarnice Shannon or Kyle Strange.

## II.   REPORT

### A.   Introduction

On November 19, 2018, Defendants filed a motion for partial summary judgment based on the affirmative defense that Plaintiff had failed to properly exhaust his administrative remedies, (R. 43); Plaintiff responded, (R. 47), and Defendants replied (R. 53). On December 11, 2018, Plaintiff filed his own motion for summary judgment, (R. 46); Defendants responded, and Plaintiff replied, (R. 55). The cross-motions are before me by order of reference, (R. 9), and are ready for resolution.

### B.   Factual & Procedural History

This case centers on Plaintiff's January 2017 transfer from one housing unit to another within Thumb Correctional Facility (TCF), and his June 2017 transfer from TCF

---

[2] Throughout the record, this defendant is variously referred to as Jeffrey and Jeffery, Oosterhof, Oasterhof, and Oasterhoff. In this Report and Recommendation, I will use the spelling that appears in Defendants' motion for partial summary judgment: Jeffery Oosterhof. (R. 43).

to G. Robert Correctional Facility (JCF).[3] (Doc. 15 at PageID.196-197). Plaintiff claims the defendants, including Griffey, violated his First Amendment rights by orchestrating one or both of his transfers in retaliation for his legal activities. (*Id.* at PageID.203-04). When Plaintiff began collaborating with other inmates on a civil case against Michigan state officials, he says, defendant Oosterhof told other defendants that Plaintiff was actually recruiting for gangs and Oosterhof wanted him gone. (*Id.* at PageID.198). Defendants Douglas, Griffey, and Schooley discussed the matter at a security meeting and decided to transfer Plaintiff to a different housing unit, separating him from his co-plaintiffs in his civil case. (*Id.*) In January 2017, Plaintiff attempted to file a grievance against Oosterhof about that transfer, but he never received a response. (*Id.*; R. 47 at PageID.611-612). He also met with defendant Douglas, who told him that he needed to cease his "legal activities and group meetings," or he would be transferred to another prison. (*Id.*)

In March 2017, "[P]laintiff was reconsidered for transfer and placed on the transfer list." (*Id.* at PageID.199). As Plaintiff sees it, the only explanation for this change in his transfer status was his legal activities; Plaintiff worked as a tutor, and he had no misconduct citations. (*Id.*).

---

[3] The relevant allegations come from Plaintiff's first amended complaint, (R. 15), which the Court granted Plaintiff permission to file in an opinion on August 31, 2018, (R. 27). The amended complaint supplemented and altered the factual basis for Plaintiff's retaliation claim. It also sought to add a conspiracy claim and six new defendants, all MDOC employees at TCF. In its opinion granting leave to amend, the Court *sua sponte* dismissed the conspiracy claim, dismissed the claims against all defendants in their official capacities, and dismissed two of the new defendants (Natalie Farnsworth and Michele Perry) from the lawsuit. (*Id.* at PageID.392).

On June 21, 2017, Defendant Shannon became upset that Plaintiff had waited until the end of Shannon's shift to send legal mail and told Plaintiff that he was going to talk to Strange about having him transferred. (*Id.*). The next day, Shannon prepared a Security Classification Screen-Review for the purpose of requesting Plaintiff's transfer. (*Id.*).

Then on June 23, 2017, Strange told Plaintiff that three of the other Defendants "were tired of [P]laintiff assisting others with grievances, and lawsuits[, and] that it was time to transfer [P]laintiff." (*Id.* at PageID.200). Strange said it was her decision whether to transfer Plaintiff, and she sought a promise that he would cease his legal activities. (*Id.*) He refused; Strange immediately instructed Shannon to take steps to transfer Plaintiff. (*Id.*)

At this point in the conversation, Plaintiff explained that they could not retaliate against him for pursuing litigation, and that he would lose his job (which he needed to support his legal activities), his family would struggle to visit him at a new location, communications with his co-plaintiffs would be strained, and he would lose access to certain prison programming. (*Id.* at PageID.201). Unmoved, Strange replied, "[W]ho is going to stop me. You wait and see," and threatened to influence defendants Griffey and Schooley to support the transfer. (*Id.*)

Three days later, Plaintiff was transferred to JCF, a more dangerous and restrictive prison. (*Id.* at PageID.202). According to Plaintiff, the consequences were severe: his new roommate, a psychiatric patient, threatened to kill him; he lost library access for a month; and all the consequences he had foretold (*e.g.*, losing his job) came to pass. (*Id.* at PageID.202-203). Plaintiff filed a grievance about his transfer in July 2017, which he

appealed through Step Three. (R. 43 at PageID.481-485). His grievance was denied at Step Three in October 2017, (*id.* at PageID.481), and he filed suit in December 2017. (R. 1).

### C.   Summary Judgment Standard

A court will grant a party's motion for summary judgment when the movant shows that "no genuine dispute as to any material fact" exists. Fed. R. Civ. P. 56(a). In reviewing the motion, the court must view all facts and inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper when the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot merely rest on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment,

the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493. And while a pro se party's arguments are entitled to liberal construction, "this liberal standard does not . . . 'relieve [the party] of his duty to meet the requirements necessary to defeat a motion for summary judgment.'" *Veloz v. New York*, 339 F. Supp. 2d 505, 513 (S.D.N.Y. 2004) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)). "[A] pro se party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D. N.Y. 1995) (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### D.    Governing Law

Congress passed the Prison Litigation Reform Act of 1995 (PLRA) in response to a "sharp rise in prisoner litigation in the federal courts." *Woodford v. Ngo*, 548 U.S. 81, 83 (2006). By passing the PLRA, Congress attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] claims [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 203 (2007). Congress equipped the PLRA with several mechanisms designed to reduce the quantity and increase the quality of the claims that came to federal court. *Id.* A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement, *Woodford*, 548 U.S. at 84: "No action shall be brought with respect to prison conditions under [§ 1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted," 42 U.S.C. § 1997e(a) (2000). Courts consider the PLRA's suits "brought with respect to prison conditions" to include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

The *Woodford* Court held that a prisoner has exhausted his or her administrative remedies when (1) no remedies currently remain available, and (2) the remedies that had been available to the prisoner were "properly" exhausted. 548 U.S. at 93. Prior to *Woodford*, there were conflicting interpretations of the PLRA's exhaustion requirement. Some circuits interpreted the exhaustion requirement to mean that plaintiffs must have no more administrative remedies available before bringing their cases to federal court. *Id.* Others interpreted it to mean that plaintiffs must have "properly" exhausted their available

remedies by following the agency's procedural requirements such as "deadlines and other critical procedural rules." *Id.*

In finding that exhaustion of remedies required "proper" exhaustion, the Court was persuaded by how "strikingly" similar the language in the PLRA is to the doctrine of exhaustion in administrative law. *Id.* at 102. It also considered the purposes behind the exhaustion requirement, reasoning that an interpretation that did not require proper exhaustion would render the PLRA "toothless"—enabling a prisoner to bypass prison remedies by simply disregarding or ignoring deadlines. *Id.* at 95. "Proper exhaustion" means that the plaintiff complied with the administrative "agency's deadlines and other critical procedural rules." *Id*. at 90. Complaints and appeals must be filed "in the place, and at the time, the prison's administrative rules require." *Id.* at 87 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002)).

In *Jones*, the Court instructed courts to look to the prison's policy itself when determining "whether a prisoner has properly exhausted administrative remedies—specifically, the level of detail required in a grievance to put the prison and individual officials on notice of the claim." 549 U.S. at 205; *id.* at 218 ("The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the *prison's requirements*, and not the PLRA, that define the boundaries of proper exhaustion." (emphasis added)). Specifically, *Jones* determined whether a plaintiff needed to identify the defendant by name during the initial grievance process. Since the MDOC's policy at the time did not require that level of specificity, the Court did not find that the PLRA required it. *Id.* at 218. However, the current MDOC policy

8

requires this level of specificity. MDOC Policy Directive ("PD") 03.02.130 (eff. July 9, 2007).

A plaintiff does not need to show proper exhaustion as a part of his or her complaint. *Jones*, 549 U.S. at 216. Rather, failure to properly exhaust remedies is an affirmative defense. *Id.*

### E.    MDOC Policy

The MDOC provides prisoners with a grievance procedure for bringing forward their concerns and complaints. *See* MDOC PD 03.02.130 (eff. July 9, 2007).[4] The MDOC's grievance procedure consists of steps that a prisoner must follow prior to filing a complaint in court, and each step is accompanied by a time limit. First, the grievant must attempt to resolve the issue with the person involved "within two business days after becoming aware of a grievable issue, unless prevented by circumstances beyond his/her control." MDOC PD 03.02.130(P).

If the initial attempt to resolve the issue with the person involved is impossible or unsuccessful, the inmate must then submit a Step I grievance form within five days. MDOC PD 03.02.130(V). If the grievance is accepted, the prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(X). The policy provides the following instructions regarding the information that needs to be included in a grievance:

---

[4] A new version of MDOC's policy directive on prisoner grievances superseded the old effective March 18, 2019. Since the PLRA requires a prisoner to exhaust all administrative remedies "as are available," 42 U.S.C. § 1997e(a) (2000), I analyze Plaintiff's compliance with the policy previously in effect.

> The issues should be stated briefly but concisely. Information provided is to
> be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when,
> where, why, how). Dates, times, places and names of all those involved in the
> issue being grieved are to be included.

MDOC PD 03.02.130(R). If the inmate is not satisfied with the response, or does not

receive a response within fifteen days, he must file a Step II appeal within ten business

days. MDOC PD 03.02.130(BB). Once again, if the inmate is dissatisfied with the response

at Step II or does not receive a Step II response within fifteen days, he has ten business

days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(FF).

The Step III response concludes the administrative grievance process. According to MDOC

policy, a grievance is not complete until the MDOC has responded to the Step III grievance.

MDOC PD 03.02.130(B). *Woodford* and *Jones* require inmates to file grievances that

conform to MDOC procedures to properly exhaust their available remedies. 548 U.S. at

93; 549 U.S. at 218.

### F.    Analysis

#### i.   Defendants' Motion for Partial Summary Judgment

Plaintiff alleges the defendants (including Griffey) retaliated against him for

exercising his First Amendment right to access the courts by arranging for him to be

transferred on one or both of two occasions: first to another housing unit, then to another

prison entirely. Defendants now bring a motion for partial for summary judgment, seeking

(1) the dismissal of claims that Douglas, Oosterhof, and Schooley retaliated against

Plaintiff by fabricating claims that he was recruiting for gang membership and holding

meetings to disrupt the operation of TCF, or by transferring him to a different housing unit

within TCF; (2) the dismissal of all claims against Douglas and Oosterhof. (R. 43 at PageID.470-471). In both cases, they say, Plaintiff has failed to exhaust his claims in the required manner (outlined in detail above).

Whether Plaintiff exhausted his claims against each of those three defendants essentially depends on their inclusion in at least one of two grievances: a January 2017 grievance about his housing unit transfer, and a July 2017 grievance about his prison transfer. I will discuss each in turn.[5]

### 1. Plaintiff's Housing Unit Transfer and January 2017 Grievance

Plaintiff attests under penalty of perjury that in January 2017 he attempted to file a grievance about Oosterhof by name,[6] as well as "unknown officials," for retaliating against

---

[5] To Plaintiff, his two transfers are inseparable: "Plaintiff do not allege discrete acts of retaliation. What Plaintiff assert is Defendant Oosterhof started the retaliation which resulted in the complicity of Defendants Douglas, and Schooley and the continuum of retaliation that lead to the ultimate transfer." (R. 47 at PageID.604). But even if both transfers were retaliation for Plaintiff's exercising his First Amendment rights, they are two distinct alleged acts: separated by six months in time, different in kind (intra- versus inter-prison transfer), and implicating different defendants (for example, defendants Strange and Shannon were allegedly involved in only Plaintiff's prison transfer, not his housing unit transfer (R. 15)). Thus, Plaintiff must have exhausted his administrative remedies as to each transfer. *See Siggers v. Campbell*, 652 F.3d 681, 691-93 (6th Cir. 2015) (finding plaintiff "was not suffering from one, continuing harm and government indifference" where prison staff rejected his mail on multiple occasions; each rejection was a "discrete event" involving "separate facts and circumstances," and he needed to file separate grievances for each). Further supporting this view, Plaintiff himself filed—or attempted to file—separate grievances about each transfer.

[6] Plaintiff attaches a copy of what is presumably this grievance to a later filing, (R. 55 at PageID.705). One sentence is difficult to read due to the scan quality of the provided copy, and a potentially crucial fragment is obscured: "This grievance is on ARUS [one or more obscured words] Officer Alcorn and unknown staff for religious harassment and retaliation for accessing the court." (*Id.*). Since I must take the evidence in the light most favorable to

11

him for exercising his First Amendment rights by transferring him to another housing unit within TCF. (R. 47 at PageID.611-612).[7] What fate befell this grievance is unclear. Some months after Plaintiff filed the grievance in the Director's Office, he says, it was returned to him with instructions that he should file it with the facility grievance coordinator; he did, but never received a response. (*Id.*).[8]

Defendants respond that this January 2017 grievance cannot satisfy the exhaustion requirement, as Plaintiff has not proven the grievance process was unavailable by providing "documentation" of his "affirmative efforts" to file the grievance. (R. 53 at 632) (citing

---

Plaintiff, and considering Plaintiff's uncontested statement under penalty of perjury that he filed a grievance against Oosterhof, *see* 28 U.S.C. § 1746, I will assume that the obscured fragment includes "Oosterhof."

[7] Though typically a court may not consider unsworn statements when ruling on a motion for summary judgment, 28 U.S.C. § 1746 creates an exception for a statement made under penalty of perjury, certified as true and correct, dated, and signed. Plaintiff's statement qualifies. (R. 47 at PageID.611-612).

[8] Plaintiff says that MDOC has not complied with an October 19, 2018, order to provide Plaintiff with a copy of the grievance, complaining, "Defendants seek summary judgment while at the same time withholding a document [the January 2017 grievance] that would defeat their claims." (R. 47 at PageID.603).

No orders were granted on October 19, 2018. Presumably Plaintiff is referring to the Court's order of October 9, 2018, on his motion to subpoena certain documents under Fed. R. Civ. P. 45—not from Defendants, but from two non-parties: Heidi Washington, director of MDOC, and Willis Chapman, warden of TCF. (R. 34 at PageID.406). There, the Court ordered production of "emails and documents sent to the Central Office Transfer Coordinator . . . related to Plaintiff's transfer," (*id.* at PageID.420), and production of copies of any grievances he filed with the Director's Office and "any extant documents detailing the reason for their rejection," (*id.* at PageID.424).

First, it appears Plaintiff is already in possession of a copy of the January 2017 grievance, as he attached it to his reply. (R. 55 at PageID.705). Second, even if Defendants admitted they had received the grievance, and an MDOC employee turned a copy over to Plaintiff, that would not "defeat their claims." The fact would remain that Plaintiff failed to exhaust all available administrative remedies, as explained below.

*Lee v. Wiley*, 789 F.3d 673, 677 (6th Cir. 2015)). Even if Plaintiff had, Defendants contend, he still could not show proper exhaustion, because MDOC grievance policy directs a grievant who does not receive a timely response at Step I to still file a Step II appeal—Plaintiff did not. (*Id.* at PageID.633); MDOC Policy Directive 03.02.130(BB) (eff. July 9, 2007) ("A grievant may file a Step II grievance if s/he is dissatisfied with the response received at Step I or if s/he did not receive a timely response."). Further, Defendants attached to their motion for partial summary judgment a report of all the grievances Plaintiff has appealed through Step III, which they say demonstrates that he is able to properly use the grievance process. (R. 53 at PageID.634).

The question, then, is whether a claimant has exhausted his available administrative grievances when he files a grievance at Step I, defendants do not respond, and the claimant does not pursue the matter further. "A prisoner's lack of compliance may be excused if the administrative remedies are not available," but a prisoner must make "affirmative efforts to comply with the administrative procedures"; the court then analyzes whether those efforts were "sufficient under the circumstances." *Lee*, 789 F.3d at 677 (internal citations and quotations omitted).

Plaintiff points to *Boyd v. Corr. Corp. of America*, 380 F.3d 989, 996 (6th Cir. 2004), where the Sixth Circuit held that "administrative remedies are exhausted when prison officials fail to timely respond to a properly filed grievance." But in *Boyd*, the court specifically noted that the prisoner had no available administrative remedies remaining to him because he "was required to wait for a grievance officer to make a decision regarding his formal grievance before he could appeal." (*Id.*) The court distinguished Boyd's

situation from that of the prisoner in *Jorss v. Vanknocker*, No. C97-3719CRB (PR), 2001 WL 823771, at *2 (N.D. Cal. July 19, 2001), which the district court had relied on below, and where the prisoner "was not foreclosed from proceeding with the prison appeal process and exhausting available administrative remedies because he did not receive a response to his formal appeal." *Id.* (internal citation omitted).

Here, like in *Jorss*, MDOC grievance policy explicitly provides an avenue for the grievant who does not receive a timely response at Step I: file a Step II grievance. MDOC Policy Directive, 03.02.130(BB) (eff. July 9, 2007). Thus, even accepting Plaintiff's contention that he filed the January 2017 grievance, he did not exhaust the administrative remedies available to him; he could have attempted to proceed to Step II, but he did not. Nor did he allege that he was precluded from pursuing an appeal by prison officials' failure to respond to his grievances at the initial level.

The January 2017 grievance is the only grievance in the record that regards Plaintiff's housing unit transfer. I therefore recommend that the court dismiss any claims stemming from Plaintiff's housing unit transfer. *See, e.g.*, *Anderson v. Jutzy*, No. 15-11727, 2017 WL 710066, at *8 (E.D. Mich. Feb. 2, 2017) (finding MDOC grievance process was not "unavailable" to plaintiff, notwithstanding any untimeliness in the Step II response, because MDOC policy explicitly makes further proceedings available even absent a timely response); *Perkins v. Nashville Sheriff Dep't*, No. 3:14-cv-02334, 2015 WL 4752620, at *3 (M.D. Tenn. Aug. 10, 2015); *Weatherspoon v. Dinsa*, No. 14-12756, 2015 WL 13741822, at *3-4 (E.D. Mich. Aug. 4, 2015), *report and recommendation adopted*, 2015 WL 5634448 (E.D. Mich. Sept. 25, 2015); *Stevens v. Potila*, No. 14-cv-10863, 2015 WL

14

1245889, at *2 (E.D. Mich. Mar. 18, 2015). *Cf. Alexander v. Hoffman*, No. 16-cv-12069, 2017 WL 3946258, at *6-7 (E.D. Mich. Sept. 8, 2017) (finding defendants not entitled to summary judgment on issue of exhaustion where plaintiff never received receipt for Step I grievance, including grievance identifier he would need to fill out Step II form, and thus "it was not clear" he had option of appealing).

Defendants specifically sought the dismissal of this claim against Douglas, Oosterhof, and Schooley. I would suggest, however, that Plaintiff also failed to exhaust his administrative remedies regarding his housing unit transfer as to defendant Griffey. Although failure to exhaust is an affirmative defense that typically must be raised by a defendant, *Jones*, 549 U.S. at 216, courts in this circuit often find that, once the defense has been raised by served defendants, it inures to the benefit of unserved defendants. *See Bragg v. Corizon Corp.*, No. 1:12-CV-917, 2013 WL 3730093, at *4–5 (W.D. Mich. July 15, 2013); *Sine v. Pandya*, No. 1:12-cv-344, 2012 WL 3729695, at *5 (W.D. Mich. July 15, 2013); *Chambers v. Michigan*, No. 1:11-cv-24, 2012 WL 718931, at *7-8 (W.D. Mich. Jan. 12, 2012), *report and recommendation adopted*, 2012 WL 718912 (W.D. Mich. Mar. 5, 2012); *Fox v. Smith*, 2011 WL 5179952, at 7-8 (W.D. Mich. Oct. 4, 2011), *report and recommendation adopted*, *Fox v. Smith*, 2011 WL 5188936 (W.D. Mich. Nov. 1, 2011); *Monk v. Bailey*, No. 1:08-cv-903, 2010 WL 4962960, at *4-5 (W.D. Mich. Oct. 28, 2010), *report and recommendation adopted*, 2010 WL 4963013, at *1 (W.D. Mich. Dec. 1, 2010). Likewise, here, the defense of failure to exhaust applies with equal force to the sole unserved defendant, Griffey (who, additionally, is not named in the January 2017 grievance). Thus, I suggest the Court also dismiss any claims against defendant Griffey

based on Plaintiff's housing unit transfer because Plaintiff has failed to exhaust his available administrative remedies on that claim as required by the PLRA and MDOC's grievance procedure.

### 2. Plaintiff's Prison Transfer Claims and July 2017 Grievance

The record contains only one grievance about Plaintiff's prison transfer, filed in July 2017 and labeled grievance TCF-17-07-0278-024-Z. (R. 43 at PageID.481-485). Three defendants' names appear in the grievance—Schooley, Shannon, and Strange—which also levels its accusation of retaliation against "unknown staff." (R. 47 at PageID.607) By Plaintiff's measure, that expansive phrase also encompassed Douglas and Oosterhof. (R. 43 at PageID.482, 484).

Defendants do not dispute that Plaintiff exhausted the claims in the grievance as to those defendants specifically named (Schooley, Shannon, and Strange). (R. 43 at PageID.469). And based on the exhibits attached to the defendants' motion for partial summary judgment, Plaintiff seems to have properly appealed the grievance through Step III. (*Id.* at PageID.476, 481-485). Thus, the question becomes whether Plaintiff exhausted the claims in the grievance against Douglas and Oosterhof by describing them only as "unknown staff." (*Id.* at PageID.484).

As an initial matter, I note that Plaintiff's amended complaint alleges Oosterhof's involvement in *only* his housing unit transfer, not his prison transfer. (R. 15 at PageID.198 (as supervisor of Plaintiff's housing unit, Oosterhof sought to have Plaintiff transferred by sending "multiple fabricated claims" to the TCF administration that Plaintiff was "recruiting for gang membership and holding meetings to disrupt the operation of the

16

facility")). Plaintiff never explicitly alleges that Oosterhof's fabricated allegations against him at the time of his housing transfer played any role in his prison transfer; it is irrelevant whether Plaintiff exhausted a claim if he does not even attempt to bring that claim in his complaint.

Besides, according to Plaintiff's own filings, it does not appear that either Oosterhof or Douglas would have been "unknown" to him at the time he filed the July 2017 grievance: He had already attempted to file the January 2017 grievance against Oosterhof by name, (R. 47 at PageID.611), and had requested a face-to-face meeting with Douglas, where Douglas allegedly threatened him, telling him "his legal activities . . . needed to stop, or he would be transferred," (R. 15 at PageID.198). *See Davis v. Heyns*, No. 1:15-CV-19, 2016 WL 11475270, at *3 (W.D. Mich. Feb. 11, 2016) ("[A]s these individuals were known to Plaintiff when he submitted this grievance, he cannot argue that [they] are compassed by the reference in his grievance to 'unknown parties.'"), *report and recommendation adopted*, 2016 WL 922789 (W.D. Mich. Mar. 11, 2016) ("[T]he Magistrate Judge pointed out that as Defendant Finco was known to Plaintiff when he submitted the grievance, he cannot plausibly argue that Defendant Finco is encompassed by the reference in his grievance to 'unknown parties.'"). Thus, I suggest the court grant Defendants' motion for summary judgment as to Oosterhof and Douglas for claims based on the prison transfer described in Plaintiff's July 2017 grievance.

One could argue that this defense should again inure to the benefit of Griffey, who is also not specifically named in the July 2017 grievance. Unlike Plaintiff's claim of retaliation by housing unit transfer, however, his claim of retaliation by prison transfer does

at least have a corresponding exhausted grievance. And Griffey is situated slightly differently than Oosterhoff and Douglas in that Plaintiff's complaint does not indicate that he knew of Griffey or his potential involvement in the transfer before he filed the July 2017 grievance. Although Plaintiff does not argue that Griffey should be considered to have been "named" in the grievance because he was "unknown" to Plaintiff at the time, presumably he saw no need to because Griffey did not join the motion for summary judgment and Defendants did not argue for Griffey's dismissal. I suggest that the issue of whether the term "unknown" in that grievance suffices to encompass a defendant whose involvement was discovered later may therefore be left for another day; the Court should not take it upon itself to dismiss Plaintiff's claim of retaliation by prison transfer against Griffey today.

### 3. Conclusion—Defendants' Motion for Partial Summary Judgment

In conclusion, I recommend that the Court grant Defendants' motion in part and: (1) dismiss defendants Douglas and Oosterhof, because Plaintiff failed to properly exhaust any claim against them; (2) dismiss all of Plaintiff's claims based on his housing unit transfer (January 2017 grievance). Plaintiff's claims against Griffey, Schooley, Shannon, and Strange based on his prison transfer (July 2017 grievance) would remain.

### ii. Plaintiff's Motion for Summary Judgment

Plaintiff also filed a motion for summary judgment against all the defendants, including Griffey, arguing he had established the elements of retaliation such that no

genuine dispute of material fact remained.[9] (R. 46). As an initial matter, because defendant Griffey has not yet been served, it would be premature to consider granting summary judgment against him; I recommend the Court deny without prejudice Plaintiff's motion as to Griffey. The remainder of my analysis in this section will deal with only those defendants who have been served.

To successfully sue on a retaliation claim, Plaintiff must establish: (1) he engaged in protected conduct, (2) the defendants took an adverse action against him "that would deter a person of ordinary firmness from continuing to engage in that conduct," and (3) the adverse action was motivated at least in part by Plaintiff's protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394-95 (6th Cir. 1995). Plaintiff argues he has established all the elements such that no genuine dispute of material fact remains. (R. 46 at PageID.584-585).

Plaintiff faces a "substantially higher hurdle" to achieve summary judgment because the burden of proof would be his at trial. *Arnett v. Myers*, 281 F.3d 552, 561-62 (6th Cir. 2001). He must present evidence that, when viewed in the light most favorable to the defendants, *no* reasonable juror could find in the defendants' favor. *Id.*; *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). "Summary judgment in favor of the party

---

[9] I pause for a point of clarification. Plaintiff apparently believes that "[t]his Court has already determined Plaintiff suffered an adverse action and the presence of a causual [sic] connection." (R. 55 at PageID.704) (citing R. 21, 27). That is untrue. The Report and Recommendation suggested only that Plaintiff's allegations were sufficient to survive a motion to dismiss when the factual allegations were accepted as true and the complaint construed in the light most favorable to him. (R. 21 at PageID.309-310). Likewise, the court considered only whether to grant Plaintiff leave to amend his complaint and screened his case; the Court did not determine that he had in fact suffered an adverse action motivated by his protected conduct. (R. 27).

19

with the burden of persuasion, however, is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

In response to Plaintiff's motion, Defendants reiterate their defense of failure to exhaust, which I discussed in detail above. They also suggest that a genuine issue of material fact exists because Plaintiff's original complaint and first amended complaint contain "conflicting statements." (R. 54 at PageID.645-646). By the Court's order, however, the amended complaint has superseded the original complaint. I would therefore suggest that discrepancies between Plaintiff's original complaint and his own first amended complaint cannot create a "genuine issue of material fact" that would spare Defendants from summary judgment.

Regardless, the specific statements that Defendants take issue with are not actually "conflicting." Defendants note that in the original complaint, Plaintiff focused on a conversation on June 23 with Strange and Shannon about improperly processed legal mail that ended in Strange telling Plaintiff he would be transferred if he continued pursuing his legal claims, (Doc. 1 at PageID.4-5). Defendants observe that Plaintiff then amended his complaint to add, among other things, allegations about a conversation with Shannon on June 21. (Doc. 15 at PageID.199). But the amended complaint, too, recounted a June 23 dispute with Strange and Shannon stemming from improperly labeled legal mail and ending with Strange telling Plaintiff he would be transferred because of his legal activities. (*id.* PageID.200-201). It is unclear how the addition of an alleged conversation with Shannon creates an issue as to any material fact.

20

But the main thrust of Defendants' reply is that Plaintiff has not established the three elements of retaliation; they argue his motion "is little more than a recitation of the conclusory allegations." (*Id.* at PageID.648-649). Further, they argue that neither of his transfers rise to the level of an "adverse action," and assert that they would therefore be entitled to qualified immunity. (*Id.* at PageID.650-653). If nothing else, they say, the record raises a genuine question of material fact as to whether Plaintiff's legal activities were a substantially motivating factor in his transfer. (*Id.* at PageID.653-654).[10]

Before diving into my analysis of Plaintiff's motion, I note that if the Court adopted my recommendations as to Defendants' motion for partial summary judgment, as explained above, the remaining defendants would be Griffey, Schooley, Shannon, and Strange, all facing Plaintiff's claim of retaliation by prison transfer. The following analysis of Plaintiff's summary judgment motion focuses on those remaining claims, but I suggest the motion should fail as to all defendants regardless of whether the Court accepts my above

---

[10] Defendants' response to Plaintiff's motion for summary judgment seeks to incorporate by reference a prior motion for summary judgment, (R. 13), that was denied as moot after Plaintiff amended his complaint. (R. 54 at PageID.642, 651). Complicating matters, the prior motion sought summary judgment for *only* defendants Shannon and Strange (R. 13). Defendants' currently pending motion seeks summary judgment *only* for Douglas, Oosterhof, and Schooley, and *only* based on Plaintiff's failure to exhaust his administrative remedies; it does not include any of the other arguments made or incorporated in their response to Plaintiff's own motion. (R. 43). The Sixth Circuit "has consistently held that arguments not raised in a party's opening brief . . . are waived." *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). Thus, I suggest Defendants can incorporate the arguments from Shannon and Strange's prior motion (R. 13) into their response only to dispute Plaintiff's motion for summary judgment—*i.e.*, to attempt to show a genuine dispute of material fact—but not to request relief for additional defendants or make additional arguments for summary judgment in their favor that were not raised in their own pending motion.

recommendation because genuine questions of material fact remain as to whether either of Plaintiff's transfers was an adverse action and whether either was motivated by his protected conduct.

### 1.  Protected Conduct

First, Plaintiff says he was engaged in in two types of protected conduct: accessing the court by sending out legal mail, and providing legal assistance to his co-plaintiffs in his civil suit. (R. 46 at PageID.585-586). Defendants do not dispute this, so I will assume for the purposes of this Report and Recommendation that no genuine issue of material fact remains as to whether Plaintiff was engaged in protected conduct.

### 2.  Adverse Action

Second, Plaintiff alleges that the defendants took several adverse actions against him, including threatening to transfer him to another prison if his protected conduct continued and making good on that threat by transferring him to JCF. (*Id.* at PageID.587-588).

"An adverse action is one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 396 (6th Cir. 1999). While "ordinarily a transfer would not deter a prisoner of ordinary firmness from continuing to engage in protected conduct," the Sixth Circuit found otherwise where a prisoner "suffered a number of foreseeable consequences"—including where he lost his high-paying job he needed to pay his attorney and where the transfer made it more difficult for his attorney to visit or represent him. *Siggers-El v. Barlow*, 412 F.3d 693, 701–02 (6th Cir. 2005). *Cf. Hix v. Tenn. Dep't of Corr.*, 196 F. App'x 350 (6th Cir. 2006) (finding

22

plaintiff failed to state a prima facie case of First Amendment retaliation where he did not allege his prison transfer caused foreseeable consequences inhibiting his ability to access court); *Jones v. Caruso*, 421 F. App'x 550, 553 (6th Cir. 2011) (finding plaintiff failed to sufficiently demonstrate that defendants should have foreseen that he would be denied smoke or tobacco-free housing at his new prison). "Even the threat of an adverse action can satisfy this element," so long as the threat is capable of deterring a person of ordinary firmness from engaging in the protected conduct. *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). "Whether a retaliatory action is sufficiently severe to deter a person of ordinary firmness from exercising his or her rights is a question of fact," and "in most cases, the question of whether an alleged retaliatory action poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law." *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002) (internal citation omitted).

Here, Plaintiff alleges a variety of foreseeable consequences resulted from his prison transfer: he was incarcerated in a "more violent," "more restrictive prison," and "placed in a cell with a psychiatric patient that threaten[ed] to kill him." (R. 15 at PageID.202). In addition, as he had forecasted, he lost his library privileges for nearly a month; lost access to some programming; found it more difficult to communicate with his co-plaintiffs in their civil case; and lost his job, which he had used to pay filing fees, pay his attorney and private investigator, buy documents to mail to them, and make phone calls to his attorney. (*Id.*). Finally, he was moved farther from his family, and the different visiting hours at the new prison made it more difficult for them to visit. (*Id.* at PageID.203).

As evidence of the violence at JCF, Plaintiff presents what appears to be a table comparing the number of assaults, sexual assaults, deaths, drug overdoses, and "fight related" injuries at TCF and JCF during some unknown time period. (*Id.* at PageID.591). And to bolster his claim that the transfers impeded his access to the courts, Plaintiff presents a statement by his co-plaintiff from his prior civil case that since the three co-plaintiffs "are now in three separate facilities, it is difficult to research arguments, access the courts, prepare updated legal arguments, exchange strategies, sign documents or pursue an appeal." (R. 55 at PageID.708).

Defendants counter with extensive evidence of their own. For example, they observe that Plaintiff's security level did not change when he was transferred. (R. 13 at PageID.67). And they rebuff Plaintiff's claim that his ability to access the courts was impaired, pointing the court to the docket for Plaintiff's prior civil case. Even after Plaintiff's prison transfer, all three co-plaintiffs were able to file objections to the Report and Recommendation on the defendants' motion to dismiss. *Heard v. Snyder,* No. 2:16-cv-14367 (E.D. Mich.) (R. 51, 53, 54). After the Report and Recommendation was adopted by the district court, Plaintiff made motions for reconsideration, *id.* at (R. 58), for an extension of time to file a notice of appeal, *id.* at (R.59), (which was ultimately granted, (R. 69)), and for an emergency hearing, *id.* at (R. 64). And he and his co-plaintiffs all filed or joined a motion for relief from judgment in early 2018, *id.* at (R. 60, 61, 62), as well as a motion for leave to appeal *in forma pauperis* in May 2018, *id.* at (R. 66), and notice of appeal, *id.* at (R. 67), followed by an amended notice of appeal in June, *id.* at (R. 71).

24

As for the loss of Plaintiff's job, Defendants corroborate Plaintiff's statement that he worked as an academic tutor at TCF, a "skilled" position for which he received a per diem stipend. (R. 13 at PageID.83). But Kimberly Napier, an Administrative Assistant at JCF, attests that in October 2017, Plaintiff had begun working as an academic tutor at his new prison, JCF—again, a "skilled" position compensated with a per diem stipend. (R. 13 at PageID.126).

Further, both Napier and Jessica France, an Administrative Assistant in the Warden's Office at TCF, attest that Plaintiff's job at TCF was not his only source of income—suggesting that any interruption in income from his job due to the transfer would not have impeded his ability to access the courts—and present copies of his Trust Account Statement to that effect. (*Id.* at PageID.81-84, 127). The first shows that between December 25, 2016, and January 25, 2018, Plaintiff received four electronic fund transfers in amounts of $10 to $30—one in January 2017 and three in February 2017. (*Id.* PageID.102-105). The second shows that he had received several electronic fund transfers since arriving at JCF, including $200 in July 2017 and $50 in September 2017. (*Id.* at PageID.127, 156, 159).

Additionally, Defendants provide records that Plaintiff placed calls to attorney Phillip Comorski both before and after his transfer. Before, he called three times in January 2017 and once in May 2017. (*Id.*). After, he made three calls in August 2017, one in September 2017, and one in January 2018. (*Id.* at PageID.147, 150, 151). Neither TCF nor JCF had any record of his making phone calls to private investigator Scott Lewis. (*Id.* at PageID.82, 126). A report of Plaintiff's visitors at TCF between August 9, 2016, and June

25

27, 2017, shows the attorney met with him once. (*Id.* at PageID.82-83). I did not see any evidence that Comorski or Lewis visited Plaintiff after his transfer to JCF.

Further, Defendants cast doubt on whether Plaintiff's family had more difficulty visiting him at JCF. According to the visitor tracking log, Plaintiff's son had not visited him at all during his most recent incarceration at TCF,[11] (R. 13 at PageID.133), but visited him once at JCF, in September 2017. (*Id.*). During his most recent incarceration at TCF, Plaintiff's mother had visited him on four dates—in August, October, and November 2016, and April 2017. (*Id.* at PageID.138). She visited him twice at JCF, in September and December 2017. (*Id.*).

In short, I suggest Defendants have established that a genuine question of material fact remains as to whether Plaintiff's prison transfer rose to the level of an adverse action, and summary judgment for Plaintiff is not warranted.

### 3. Causation

The court need not dwell on whether Plaintiff's housing unit and prison transfers were adverse actions, however, because a genuine question of material fact also remains as to the motivations of Schooley, Shannon, and Strange.

Plaintiff argues he has established that his prison transfer was motivated by his protected conduct based on how soon he was transferred to JCF after some defendants'

---

[11] It appears Plaintiff had previously been incarcerated at TCF, as the record shows his son visiting him there in November 2003 and in January and May 2004. (R. 13 at PageID.133-134). Over the course of the next decade, Plaintiff was transferred to three other prisons, each of which his son paid a visit to. (*Id.*). He returned to TCF in August 2016. (R. 15 at PageID.197).

threats and demands that he stop working on his civil case. (*Id.* at PageID.588-589).

Further, he notes that he was transferred out of his housing unit in January 2017, the very

month after he and his co-plaintiffs had filed their civil suit. The Sixth Circuit has

recognized "the difficulty in producing direct evidence of an official's retaliatory motive;

circumstantial evidence of causation may suffice. *Hill v. Lappin*, 630 F.3d 468, 476 (6th

Cir. 2010); *Holzemer v. City of Memphis*, 621 F.3d 512, 525-26 (6th Cir. 2010). Still, the

Sixth Circuit "has been reluctant to find that such evidence alone establishes retaliatory

motive." *Hill*, 630 F.3d at 476.

Defendants, meanwhile, point to the affidavits attached to their prior motion for

summary judgment and interrogatories. Natalie Farnsworth, the Transfer Coordinator at

TCF, submitted a notarized affidavit that Plaintiff "was identified as a candidate for transfer

as early as January 2017." (R. 13 at PageID.64). Then in March 2017, she received an email

from Douglas listing several prisoners, including Plaintiff, to be considered for a transfer.

(*Id.* at PageID.64, 70). She explained that Plaintiff was ultimately transferred to JCF

because of a June 2017 request from her counterpart at JCF to "trade" for a JCF prisoner

who had been recommended for a transfer. (*Id.* at PageID.65). The transfer had originally

been scheduled for June 15, 2017, but was delayed until June 27 so the incoming prisoner

could attend a medical appointment. (*Id.*). Because Farnsworth was out of the office, on

June 22, 2017, one of her colleagues asked Shannon to complete the Security Classification

Screen – Review for Plaintiff; Shannon complied the same day. (*Id.* at PageID.65-66).

MDOC Central Office in Lansing approved the transfer, as required, sometime around June

26. (*Id.* at PageID.66). (Farnsworth gives the date as June 26, 2016—rather than 2017—

but this appears to be simply a typographical error.) She then gave the Security Classification Screen – Review to Strange and Griffey for their signatures, which they gave. (*Id.*).

Farnsworth had no memory of speaking with defendants Strange (at least, prior to seeking her signature) or Shannon about Plaintiff's transfer, and, to the best of her knowledge, neither Strange nor Shannon requested the transfer or had input in selecting the prison to which he would be transferred. (*Id.* at PageID.66). She "was not aware that [Plaintiff] was involved in any lawsuits during his time at TCF" and did not "hear or receive any correspondence referencing this as a reason for his transfer." (*Id.* at PageID.67).

In response to interrogatories, defendant Shannon—who was at all relevant times a Prison Counsellor at TCF—denied in a sworn statement that he had requested Plaintiff be transferred, that it had been his idea to initiate Plaintiff's transfer, or that Strange had instructed him to initiate the process. (R. 17 at PageID.246, 249-250). Shannon stated that neither he nor Strange has the authority to initiate the transfer of any prisoner. (*Id.* at PageID.248).

Similarly, defendant Strange—who served as a Resident Unit Manager at TCF, (*Id.* at PageID.257)—said in her sworn statement that she "did not specifically authorize or instruct Defendant Shannon to prepare and submit a security classification screen to have Plaintiff transferred." (*Id.* at PageID.260). Strange attests that she did not request Plaintiff's transfer or have input on which facility he was transferred to. (*Id.*). When the transfer coordinator requests a security screen for a prisoner to transfer, the Assistant Resident Unit Supervisor or Prison Counselor completes a screen; Strange then reviews the screen for

28

accuracy and signs it before the prisoner is transferred. (*Id.* at PageID.259). She also "regularly participate[s] in the Security Classification Committee which at times is involved in facilitating transfers." (*Id.*).

Here, she says, the extent of her involvement was signing the Security Classification Screen – Review on Plaintiff. (*Id.* at PageID.261). She does not maintain a list of prisoners pending transfer or requesting to be transferred. (*Id.* at PageID.267). Strange also provided an email from July 2017 sent in response to defendant Griffey's investigation of Plaintiff's July 2017 grievance; Strange's email states, in relevant part, "There was no discussion with Ms. Farnsworth or Mr. Shannon about me wanting [Plaintiff] to be transferred." (*Id.* at PageID.275).

Considering all the above evidence, I suggest Defendants have presented evidence that a material dispute remains as to whether defendants Shannon or Strange were motivated by Plaintiff's protected conduct to transfer him. Defendants present little evidence regarding Griffey or Schooley specifically, but their evidence generally puts in contention that Plaintiff's transfer was at all motivated by his protected conduct. For example, France stated that Plaintiff "was transferred to open bed space to accommodate an incoming prisoner." (R. 13 at PageID.81-82). That does not explain how Plaintiff was chosen from among all the other prisoners at the facility for this transfer—in other words, her statement establishes an innocent motive for a transfer to be scheduled, but it does not rule out a retaliatory motive for Plaintiff's selection as the person to fill that spot. Still, taken in the light most favorable to Defendants, the evidence suggests a non-retaliatory

motive for Plaintiff's transfer that would encompass Schooley, such that a reasonable jury might rule in Defendants' favor.

### 4. Conclusion—Plaintiff's Motion for Summary Judgment

In short, Defendants have presented enough evidence that Plaintiff's transfer was motivated by innocent purposes that a reasonable jury could find in their favor, *Arnett v. Myers*, 281 F.3d 552, 561-62 (6th Cir. 2001); I suggest, therefore, that Plaintiff has failed to justify summary judgment on his behalf. Because I determine Plaintiff's motion fails for the foregoing reasons, I find it unnecessary to reach the question of whether any or all defendants are entitled to qualified immunity.

### G. Overall Conclusion

For the reasons explained above, **IT IS RECOMMENDED** that the Court **GRANT IN PART** Defendants' Motion for Partial Summary Judgment, (R. 43), and **DENY** Plaintiff's Motion for Summary Judgment, (R. 46).

If the Court accepts this Report and Recommendation in its entirety:

- Defendants Douglas and Oosterhoff will be dismissed because Plaintiff failed to exhaust his administrative remedies as to them.

- Defendants Griffey and Schooley will face Plaintiff's claim of retaliation by prison transfer; any claims against them stemming from Plaintiff's housing unit transfer will be dismissed.

- No change will be made as to defendants Shannon and Strange, who Plaintiff has alleged retaliated against him by arranging his prison transfer.

30

### III.   REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  May 10, 2019                    S/ PATRICIA T. MORRIS
                                       Patricia T. Morris
                                       United States Magistrate Judge

## **CERTIFICATION**

     I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.  A copy was also sent via First Class Mail to Lamont Heard #252329 at Lakeland Correctional Facility, 141 First Street, Coldwater, MI 49036.

Date: May 10, 2019                     By s/Kristen Castaneda
                                       Case Manager

32